**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br> Plaintiff,<br>   v.<br><br>APPROXIMATELY 21.17 BTC SEIZED FROM ADDRESS 3JB9jkioXqmKS9AbGZFhFyVPPR35Pla43x; AND APPROXIMATELY 76.56 ETH SEIZED FROM ADDRESS 0x9A4131652f2bB5C2302e4bB8C15325A3CD58d4d3, BOTH ASSOCIATED WITH COINBASE ACCOUNT USER IDENTIFICATION 685fd785f1ce0a64c5b884bf,<br>       Defendants *in Rem.* | )<br>)<br>)<br>)<br>)<br>)   Civil Action No.: 26-cv-13515<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

The United States of America, by its attorney, Leah B. Foley, United States Attorney for the

District of Massachusetts, in a civil action of forfeiture *in rem* pursuant to 18 U.S.C. §§ 981(a)(1)(A)

and (C) and Supplemental Rule G of the Federal Rules of Civil Procedure for Admiralty or Maritime

Claims and Asset Forfeiture Actions, alleges that:

**NATURE OF ACTION**

1.      This action is brought by the United States of America pursuant to 18 U.S.C.

§§ 981(a)(1)(A) and (C), seeking civil forfeiture of the following virtual currency:

   a. approximately 21.17 BTC seized from address
      3JB9jkioXqmKS9AbGZFhFyVPPR35Pla43x; and

   b. approximately 76.56 ETH seized from address
      0x9A4131652f2bB5C2302e4bB8C15325A3CD58d4d3,

both associated with Coinbase account User Identification 685fd785f1ce0a64c5b884bf

(the "Defendant Property").

2.      As alleged herein, the Defendant Property is subject to forfeiture because it is

traceable to proceeds of a conspiracy to obtain funds fraudulently by Democratic Republic of

North Korea ("DPRK" or "North Korea") information technology ("IT") workers, and because it is property involved in laundering those proceeds, including transactions designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds, for transfer back to DPRK and other entities sanctioned by the Department of the Treasury Office of Foreign Assets Control ("OFAC").

## BACKGROUND

### DPRK IT Worker Schemes

3.     Since 2003, the DPRK has been under sanction by the United Nations ("UN") due to its testing and expansion of its nuclear weapons program.  Since 2016, the United States has had comprehensive sanctions against North Korea, the effect of which is to cut off the DPRK from the U.S. financial system and limit the ability of U.S. persons and companies to do business with North Koreans.  As a result, North Korea has sponsored various schemes designed to earn money for the regime.

4.     In May 2022, the Department of State, the Department of Treasury, and the Federal Bureau of Investigation ("FBI") issued an advisory (the "Advisory") that the DPRK has dispatched thousands of highly skilled IT workers around the world to earn revenue to support the DPRK weapons programs, in violation of U.S. and U.N. sanctions.  According to the Advisory, the DPRK IT workers involved in this conspiracy deliberately obfuscate their identities and nationality online and otherwise by creating personas using falsified or stolen identification documents.  In order to appear as though they are connecting to the internet from inconspicuous locations outside the DPRK, they obfuscate their location by using virtual private networks, virtual private servers, or third-country internet protocol ("IP") addresses.  Using these and other techniques, the DPRK workers surreptitiously obtain remote IT employment from companies across a variety of sectors and industries around the world, including the United States.

5. The DPRK IT workers are located primarily in the People's Republic of China ("China")—specifically, near the North Korean border in Shenyang, China—and in the Russian Federation. According to a March 2024 United Nations Security Council Panel of Experts Report, approximately 1,000 DPRK IT workers also operate from cities inside North Korea, including from Shinuiju, a city on the border with China.

6. DPRK IT workers are often aided in this conspiracy by U.S.-based facilitators. In exchange for a fee, these facilitators provide a range of services to the overseas IT workers, including: (1) receiving laptop computers from defrauded companies on the IT workers' behalf; (2) hosting the laptop computers in their homes; (3) installing remote desktop applications on the laptop computers, thus enabling the overseas IT worker to access the computer from abroad; (4) receiving paychecks from the defrauded companies on the IT workers' behalf via the mail at their U.S-based address or via direct deposit into their U.S. based financial account(s); and (5) transferring money paid by the defrauded companies from their U.S.-based financial accounts to financial accounts controlled by the DPRK IT workers.

7. North Korean IT workers often create and use domain names and U.S.-based limited liability companies ("LLCs") in furtherance of their fraudulent activity and to mask their true identities as North Koreans. The North Korean IT workers paid for these domains using, among other means, virtual currency. The North Korean IT workers used the LLCs, among other things, to recruit the U.S.-based facilitators described above. In fact, these LLCs were shell companies with no legitimate U.S. operations and are used by overseas individuals and their domestic proxies to create the appearance of a legitimate U.S. business.

8. The proceeds of this conspiracy—that is, the salary payments made by the victim companies—are primarily paid to accounts at U.S. banks and online money transfer services registered by the U.S.-based facilitators in their names and the names of shell companies. To

conceal their origin, the North Korean IT workers and/or their money laundering co-conspirators often laundered the proceeds to and through the financial accounts of co-conspirators, including through multiple hosted and unhosted virtual currency wallets and converting the proceeds to different types of virtual currency. The North Korean IT workers and/or their money laundering co-conspirators used some of the proceeds to purchase infrastructure used in furtherance of the conspiracy, and much of the proceeds are subsequently transferred overseas, including to banks located in China.

9.      In June 2025, several overseas money launderers and Zhenxing ("Danny") Wang, a U.S.-based facilitator, who participated in a scheme to obtain remote work for DPRK IT worker from U.S. companies were charged by indictment in the District of Massachusetts for conspiracies to commit wire fraud and mail fraud, money laundering, identity theft, damage to a protected computer and violate the International Emergency Economic Powers Act, all in furtherance of the DPRK IT workers conspiracy. *See United States v. Wang, et al.*, 1:25-cr-10273-NMG (the indictment is attached hereto as Exhibit A and incorporated by reference herein). Danny Wang pleaded guilty and was sentenced in April 2026 to 92 months in prison.

10.      Another U.S. facilitator, Kejia ("Tony") Wang, agreed to plead guilty to an Information also filed in the District of Massachusetts charging him with conspiracies to commit wire fraud and mail fraud, money laundering, and identity theft all in furtherance of the same DPRK IT worker conspiracy. *See United States v. Wang*, 1:25-cr-10274-NMG (the information is attached hereto as Exhibit B and incorporated by reference herein). In April 2026, Tony Wang was sentenced to 108 months in prison.

11.      The conspiracy perpetrated a massive fraud that impacted more than 100 U.S. companies. The victimized U.S. companies spanned multiple industries across much of the United States, including Massachusetts, California, New York, New Jersey, Florida, New Mexico, Georgia,

4

Maryland, Alabama, North Carolina, Illinois, Ohio, South Carolina, Michigan, Texas, Indiana, Arkansas, Missouri, Tennessee, Minnesota, Rhode Island, Wisconsin, Oregon, Pennsylvania, Washington, Utah, Colorado, and the District of Columbia.

## The Defendant Property

12.    Following the unsealing of the charges in *United States v. Wang, et al.*, 1:25-cr-10273-NMG, law enforcement continued to trace the flow of funds from the victimized U.S. companies, to and through the co-conspirators' financial accounts, and into virtual currency accounts and overseas accounts.

13.    As a result of this tracing, the United States identified the Defendant Property as proceeds of unlawfully obtained salaries paid by U.S. victim companies, in violation of 18 U.S.C. § 1030 and 18 U.S.C. § 1343, and as property involved in laundering those proceeds and conspiracy to commit money laundering.

14.    The Defendant Property consists of the virtual currencies BTC (bitcoin) and ETH (ether) seized by the Department of Homeland Security – Investigations on or about August 26, 2025, from wallets associated with an account held at Coinbase in the name of Aliasghar Afrouz. After execution of the seizure warrant, the Defendant Property was transferred to a U.S. government-controlled wallet, where it remains.

15.    Coinbase, Inc. is a U.S.-based centralized virtual currency exchange that provides trading and storage platforms for virtual currencies, such as BTC and ETH.

16.    Records maintained by Coinbase indicated that Afrouz is an Iranian national and a resident of Spain.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1345 and 1355, which confer original jurisdiction to district courts of all civil actions, suits, or proceedings

5

commenced by the United States and any action for the forfeiture of property incurred under any act of Congress.

18.    Venue is proper pursuant to 28 U.S.C. §§ 1355(b)(1) and 1395 because acts and omissions giving rise to the forfeiture occurred in the District of Massachusetts.

## STATUTORY AUTHORITY

19.    18 U.S.C. § 1030(a)(2)(C) makes it a crime, *inter alia*, to intentionally access a computer without authorization and thereby obtain information from any protected computer.  18 U.S.C. § 1030(a)(4) makes it a crime, *inter alia*, to knowingly and with intent to defraud, access a protected computer without authorization, and by means of such conduct further the intended fraud and obtain anything of value.  18 U.S.C. § 1030(a)(5)(A) makes it a crime, *inter alia*, to knowingly cause the transmission of a program, information, code, or command, and as a result of such conduct, intentionally cause damage without authorization, to a protected computer.  The term "protected computer" is defined in 18 U.S.C. § 1030(e)(2) and includes, *inter alia*, a computer used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States.  *See Van Buren v. United States*, 141 S. Ct. 1648, 1652 (2021) (definition of protected computer under 18 U.S.C. § 1030(e)(2)(B) includes "at a minimum . . . all computers that connect to the Internet").

20.    18 U.S.C. § 1343 makes it a crime for anyone, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, to transmit or cause to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

6

18 U.S.C. § 1349 makes it a crime to attempt, or to conspire to commit, wire fraud in violation of 18 U.S.C. § 1343.

21.     Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a specified unlawful activity, specifically violations of 18 U.S.C. § 1030 (computer fraud and abuse) and 18 U.S.C. § 1343 (wire fraud), or a conspiracy to commit such offenses, is subject to civil forfeiture.  Pursuant to 18 U.S.C. § 1956(c)(7)(D), a violation of 18 U.S.C. § 1030 (computer fraud and abuse) is a specified unlawful activity.  Pursuant to 18 U.S.C. § 1956(c)(7)(A), incorporating to 18 U.S.C. § 1961(1), a violation of 18 U.S.C. § 1343 (wire fraud) is a specified unlawful activity.

22.     18 U.S.C. § 1956(a)(1)(A)(i) makes it a crime to conduct or attempt to conduct a financial transaction, knowing that the property involved in the transaction represents the proceeds of some form of unlawful activity, and which in fact involves the proceeds of specified unlawful activity, with the intent to promote the carrying on of specified unlawful activity.  This offense is sometimes referred to as promotional money laundering.  18 U.S.C. § 1956(a)(1)(B)(i) makes it a crime to conduct or attempt to conduct a financial transaction, knowing that the property involved in the transaction represents the proceeds of some form of unlawful activity, and which in fact involves the proceeds of specified unlawful activity, knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.  This offense is sometimes referred to as concealment money laundering.  18 U.S.C. § 1956(h) criminalizes a conspiracy to violate § 1956.

23.     Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 (money laundering), including 18 U.S.C. § 1956(h) (conspiracy to commit money laundering), is subject to civil

forfeiture. "Property involved in" includes the proceeds funds being laundered, any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense. *See United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003) (quoting *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998) (internal citation and quotation marks omitted)). "Facilitation occurs when the property makes the prohibited conduct less difficult or more or less free from obstruction or hindrance." *Id.* Forfeiture of commingled funds is proper when the government demonstrates that the comingling of funds facilitated or obscured the illegal scheme. *Id.*

## VIRTUAL CURRENCY BACKGROUND

24.     Virtual currencies (also known as cryptocurrencies) are digital tokens of value circulated over the Internet. Virtual currencies are typically not issued by any government or bank like traditional fiat currencies, such as the U.S. dollar, but rather are generated and controlled through computer software. Each virtual currency transaction is recorded on a blockchain. A blockchain is a distributed ledger, recorded on a decentralized network, containing an immutable and historical record of every transaction made with the virtual currency. The blockchain can be updated multiple times per hour and records every virtual currency address that has ever received that virtual currency and maintains records of every transaction and all the known balances for each virtual currency address. Different virtual currencies operate on different blockchains, and there are many different, widely used virtual currencies currently in circulation. BTC and ETH are currently among the most well-known virtual currencies in use. BTC exists on the Bitcoin blockchain, and ETH exists on the Ethereum network.

25.     Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency.

8

Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

26.     Tether ("USDT") is a stablecoin.  Each USDT token is worth $1.00 USD and claimed to be backed by $1.00 USD in physical reserves.

27.     Virtual currency addresses are the specific virtual locations to which such currencies are sent and received.  A virtual currency address is analogous to a bank account number and is represented as a string of alphanumeric characters.  A user of virtual currency can utilize multiple addresses at any given time, similar to bank accounts, and there is no limit to the number of addresses any one user can utilize.

28.     Each virtual currency address is controlled through a unique corresponding private key, a cryptographic equivalent of a password, which is needed to access the address.  Only the holder of an address's private key can authorize a transfer of virtual currency from that address to another address.

29.     There are various types of virtual currency wallets, including software wallets, hardware wallets, and paper wallets.  The virtual currency wallets at issue for the purposes of this affidavit are software wallets (*i.e.*, a software application that interfaces with the virtual currency's specific blockchain and generates and stores a user's addresses and private keys).  A virtual currency wallet allows users to store, send, and receive virtual currencies.  A virtual currency wallet can hold many virtual currency addresses at the same time.

30.     Wallets that are hosted by third parties are referred to as "hosted wallets" because the third party retains a customer's funds until the customer is ready to transact with those funds.  Conversely, wallets that allow users to exercise total, independent control over their funds are often called "unhosted" wallets.

9

31.     Virtual Currency Exchanges ("VCEs"), such as Binance and Coinbase, are trading and/or storage platforms for virtual currencies (*e.g.*, BTC and ETH).  There are generally two types of VCEs: centralized exchanges and decentralized exchanges, which are also known as "DEXs."  Binance and Coinbase are centralized exchanges.  Many VCEs also store their customers' virtual currency in virtual currency wallets.  As previously stated, these wallets can hold multiple virtual currency addresses associated with a user on a VCE's network.  Because VCEs act as money services businesses, they are legally required to conduct due diligence of their customers (*i.e.*, know your customer or "KYC" checks) and to have anti-money laundering programs in place (to the extent they operate and service customers in the United States).

## FACTUAL ALLEGATIONS

### Description of the Defendant Property

32.     The Coinbase account in the name of Afrouz was opened on or about June 28, 2025.

33.     Within the Afrouz Coinbase account, the BTC wallet 3JB9jkioXqmKS9AbGZFhFyVPPR35Pla43x (the "Coinbase BTC Wallet") was created on or about July 17, 2025.

34.     On or about July 22, 2025, the Coinbase BTC Wallet received five separate transfers from 3KcrneQbUQwTgSDbnhaMNyafyaCp7aZiKR ("**3Kcrne**"), for a total transfer of 21.1716 BTC.  The U.S. dollar value of the BTC transfers on July 22, 2025 was approximately $2,525,604.94.

35.     Within the Afrouz Coinbase account, the ETH wallet 0x9A4131652f2bB5C2302e4bB8C15325A3CD58d4d3 (the "Coinbase ETH Wallet") was created on or about July 20, 2025.

10

36.     On or about July 20, 2025, the Coinbase ETH Wallet received one transfer of 1 ETH from 0x728757c49593565724e5ddDcEB5D985aF1aAD22e ("**0x7287**").

37.     On or about July 22, 2025, the Coinbase ETH Wallet received four additional transfers from **0x7287**.  In total, 76.56271 ETH was transferred to the ETH Wallet.  The U.S. dollar value of the ETH transfers on July 20, 2025, and July 22, 2025, was approximately $283,636.75.

38.     No other transfers were made into the BTC Wallet or the ETH Wallet.

### Source of Criminal Proceeds and Initial Laundering

39.     During the course of the investigation into Danny Wang and Tony Wang, investigators traced proceeds from the DPRK IT worker scheme and identified multiple methods used to launder fraudulently obtained payments by DPRK IT workers, including by converting payments to virtual currency and transferring proceeds through a series of intermediary virtual currency wallets, as described in more detail below, including the Coinbase BTC Wallet and the Coinbase ETH Wallet, where law enforcement eventually seized the virtual currency.

40.     In general terms, the fraudulent IT workers directed the U.S. victim companies to deposit their wages as fiat currency into online money service business ("MSB") accounts that allow cross-border payment solutions.

41.     The MSB accounts were often opened in the name of shell companies set up by Tony Wang, Danny Wang, and other co-conspirators.  From those accounts, proceeds were transferred directly to MSB accounts controlled by co-conspirators—assessed to be professional money launderers—located in China, Taiwan, or the United Arab Emirates ("UAE").

42.     The co-conspirators also used funds from these MSB accounts to purchase virtual currency.

43.     Criminal and nation state cyber actors often convert fiat currencies into virtual currency because it allows them to transfer funds overseas without needing to use traditional

11

banking methods, which are subject to more stringent anti-money laundering controls.

44.    Exchanging fiat currency for virtual currency also allowed the co-conspirators to pay for the infrastructure necessary to conduct their operations.  For example, co-conspirators charged in *United States v. Wang, et al.* used virtual currency to purchase web domains, web hosting platforms, and hardware devices for the conspiracy.  The co-conspirators also used virtual currency to purchase physical infrastructure, hardware and software, to conceal that the IT workers were not in the United States.

45.    For example, one of the MSB accounts used in this manner belonged to Meng Ting LIU, who was charged with conspiracy to commit money laundering in *United States v. Wang*, 1:25-cr-10273-NMG.  LIU is a citizen and national of Taiwan, who controlled two MSB accounts used in furtherance of the charged conspiracies.  The approximate amount of wages paid into LIU's MSB accounts during this period was $1,644,108.92.

46.    From in or around July 2023 to November 2024, some of those funds paid into LIU's MSB accounts were used to purchase approximately 1,163,041 USDT.  The majority of the USDT was eventually transferred to China-based banks and withdrawn into fiat Chinese currency.

47.    Some of the USDT deposited into one of LIU's MSB accounts was transferred to the intermediary wallets which, in turn, funded the wallets containing the Defendant Property.

48.    In 2024, LIU transferred a total of 24,385.16 USDT through an intermediary unhosted wallet to unhosted wallet 0xD995924483724d416827C932dd7A0544BEFD427e ("**0xD9959**").

49.    The **0xD9959** address is a virtual currency wallet used to aggregate fraudulently obtained IT worker funds and has been active at least since in or around June 2024.

50.    From in or around June 2024 to present, approximately $1,709,676 worth of

12

virtual currency has been deposited into the **0xD9959** from intermediary unhosted wallets used to receive DPRK IT worker salary payments and to purchase infrastructure to further the DPRK IT worker schemes under investigation.

51.     The USDT from LIU, and other funds from DPRK revenue generation schemes, were transferred from **0xD9959** to a wallet hosted at the virtual currency exchange Binance, in an account controlled by Reza Mehran ("MEHRAN"), specifically the KHAER Binance Account, defined below.



*Figure 1: Illustration of the transfer of U.S. dollars to a Mehran-controlled Binance Account*

52.     MEHRAN is an Iranian National and resident of the UAE.

**Further Laundering of Criminal Proceeds**

53.     MEHRAN registered and/or controlled several accounts at Binance, some using MEHRAN's own name and some using the names of other persons, including Binance UID 761537764 in the name of Abdul Kader Abul Khaer (the "KHAER Binance Account"); Binance UID 463005093 in the name of Monjur Hossen Abu Taher (the "TAHER Binance Account"); and Binance UID 86835156 in the name of Saeed Hamid NEMATOLAHI (the "NEMATOLAHI Binance Account").

54.     MEHRAN's control over these three Binance accounts was determined through the accounts' registration or KYC records.  Specifically, the registration for the accounts used

information associated with MEHRAN, including but not limited to, photographs of MEHRAN, email addresses associated with MEHRAN, phone numbers associated with MEHRAN, and references to the same the business owned or otherwise controlled by MEHRAN, Al Qanawat Trading Co. LLC.

55.     Internet protocol ("IP") address connection logs show that the three Binance accounts were accessed from the same IP address, often at the same time, indicating the accounts were being operated from the same location.

56.     To date, law enforcement has identified more than 40 deposits of virtual currency into various MEHRAN-controlled Binance accounts worth approximately $1,916,219.80 that represent the proceeds of illicit DPRK revenue generation schemes, including funds from individuals indicted in *U.S. v. Wang, et al.* for their roles with those same activities.

57.     MEHRAN-controlled Binance accounts, specifically the KHAER Binance Account, also received funds from North Korean national and North Korea's Foreign Trade Bank ("FTB") employee Sim Hyon-Sop ("SIM"), who was indicted in the District of Columbia for his role in generating revenue for North Korea and its WMD program through the purchase and sale of tobacco and other products. *See United States v. Sim,* 1:23-cr-00091 (D. D.C.). FTB, SIM, and the virtual currency wallet from which SIM transferred funds to the KHAER Binance Account have been designated by the Department of Treasury's OFAC sanction list.

58.     Transaction history also shows numerous transfers among and between the MEHRAN-controlled Binance Accounts and unhosted wallets, including following:

    a.  **3Kcrne**;

    b.  bc1qp9hnrg4vrrcqmtkvavxwclvepsg7cwretwzwgy ("**bc1qp9h**")

    c.  3BvRoZUzJwG4gX8yG2fXL2WgJRWKA7KwqC ("**3BvRoZ**")

59.     Law enforcement has associated the address **bc1qp9h** with a February 21, 2025, North Korean cyber-attack that stole approximately $1.5 billion in ETH and other virtual currencies from UAE-based virtual currency exchange Bybit.  Specifically, the address **bc1qp9h** is one of several intermediary wallets that some of the stolen Bybit ETH was transferred through.

60.     While the identity of the owner of an unhosted wallet is generally anonymous, law enforcement can identify the owner of a particular virtual currency address by, among other things, analyzing transactions recorded on blockchains.  The analysis can also reveal additional addresses controlled by the same individual or entity.

61.     These three addresses (**3KCrne**, **bc1qp9h**, and **3BvRoZ**) interact with each other in manner that is consistent with money laundering and suggests the same individual— MEHRAN—controls all three unhosted wallets.

62.     The MEHRAN-controlled Binance accounts received funds (*i.e.*, IT worker salary payments) from the MSB accounts, through the **0xD9959** address, and then systematically layered and comingled the illicit funds with other funds in his various wallets.  This laundering was accomplished through high volumes of transactions, swaps from BTC to USDT (and *vice versa*), and numerous transfers to and from hosted and unhosted wallets under MEHRAN's control.  Following this laundering cycle, MEHRAN integrated the "washed" funds back into his Binance accounts from addresses with no direct ties to illicit activity.

63.     The purpose of this laundering activity was to allow the proceeds to be integrated back into the financial institution—Binance—through transactions that did not have direct exposure to any illicit activity. Once in a Binance account, MEHRAN could continue to both sell and buy BTC and USDT over multiple trades to further comingle those funds and continue the laundering cycle.

64. For example, from in or around May 2022 and May 2025, these three unhosted wallets (**bc1qp9h**, **3BvR0Z**, and **3Kcrne**) cumulatively received approximately 297.15 BTC from the KHAER, TAHER, and NEMATOLAHI Binance accounts, controlled by MEHRAN. Most of this virtual currency was subsequently transferred between the three unhosted wallets and then deposited back into the TAHER or KHAER Binance accounts.

65. Between in or around May 2022 and in or around April 2025, the TAHER Binance account conducted 292 trades involving the purchase or sale of BTC for USDT and vice versa. Specifically, during this timeframe, MEHRAN used this account to purchase approximately 1,638.48 BTC using USDT and sell approximately 1,619.36 BTC for USDT. During this timeframe, the TAHER Binance account received approximately 254.82 BTC in 23 deposits and transferred approximately 259.50 BTC in 15 withdrawals to other addresses. Every deposit of BTC to the TAHER Binance account came from one of the three unhosted BTC wallet addresses discussed above (**3KCrne**, **bc1qp9h**, and **3BvRoZ**), and every withdrawal of BTC was sent to either the **3Kcrne** or **3BvRoZ** address.

66. From in or around October 2023 and June 2025, the KHAER Binance account conducted 96 trades involving the purchase or sale of BTC for USDT and vice versa. Specifically, during that timeframe, MEHRAN used this account to purchase approximately 79.85 BTC using USDT and sell approximately 96.93 BTC for USDT. During this timeframe, all BTC deposits in the KHAER Binance account were from the **bc1qp9h** address, four of the six withdrawals of BTC were transferred to **bc1qp9h**, and the remaining two withdrawals were transferred to an unidentified addresses for negligible amounts (0.04 BTC).

67. Specifically, during this timeframe, the KHAER Binance account received approximately 46.32 BTC in 35 deposits from **bc1qp9h**, and transferred approximately 26.77 BTC in four withdrawals to the **bc1qp9h** address.

16

68.     The transfers among the unhosted wallets and MEHRAN-controlled Binance accounts, described above, are reflected in Figure 2, with the value of the virtual currency transferred shown in U.S. dollars.



*Figure 2: Illustration of the transfer of virtual currency between and among Mehran-controlled unhosted wallets and Binance accounts, and then to the Coinbase Account (U.S. dollar amounts represent the value of virtual currency at the time of transfers)*

**Transferring Laundered Proceeds to the Coinbase Account**

69.     On or about May 30, 2025, the KHAER Binance Account transferred 20.68 BTC to **bc1qp9h**.  At the time of this transfer, there was a small residual balance in **bc1qp9h** from previous deposits from MEHRAN-controlled accounts.

17

70.    Approximately one hour and thirty minutes later, on or about May 30, 2025, that 20.68 BTC was transferred from **bc1qp9h** to **3Kcrne**.

71.    As noted, on or about July 22, 2025, 21.1716 BTC was transferred from **3Kcrne** to the BTC Wallet at Coinbase.

72.    Between on or about February 19, 2025 and on or about April 17, 2025, the TAHER Binance account transferred 76.562 ETH to **0x7287**.  From July 20 to July 22, 2025, **0x7287** transferred the same amount, 76.562 ETH, to the Coinbase ETH Wallet.

73.    To convert virtual currency to fiat currency, virtual currency must be deposited into a hosted wallet at a virtual currency exchange where it can be exchanged for fiat currency within the exchange customer's account, deposited into the account of an over-the-counter broker who provides the customer with fiat currency, or used to pay for the infrastructure necessary to conduct their operations.

## CONCLUSION

74.    As described above, investigators identified more than 40 deposits of virtual currency into MEHRAN's various Binance accounts worth approximately $1,916,219.80 (as of the date of the funds were seized) that represent the proceeds of illicit DPRK revenue generation schemes during the same timeframe.  This includes funds from SIM, a sanctioned North Korean banker, and others that were recently indicted in *U.S. v. Wang, et al.* for their roles with those same activities.  It also includes funds traced back to the North Korean cyber-attack perpetuated on Bybit.

75.    The Defendant Property are proceeds of a DPRK IT worker conspiracy that have been comingled with other funds, moved through intermediary wallets, changed forms of virtual currency, among other money laundering tactics, all to conceal the funds' illicit origins.

## FIRST CLAIM FOR FORFEITURE
(18 U.S.C. § 981(a)(1)(C))

76.    The allegations contained in paragraphs 1 to 75 are incorporated herein.

77.    As set forth above, the Defendant Property is property, real or personal, which constitutes or is derived from proceeds traceable to an offense constituting a "specified unlawful activity," specifically computer intrusion in violation of 18 U.S.C. § 1030 and wire fraud in violation of 18 U.S.C. § 1343, or a conspiracy to commit such offenses.

78.    Accordingly, the Defendant Property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM FOR FORFEITURE
### (18 U.S.C. § 981(a)(1)(A))

79.    The allegations contained in paragraphs 1 to 75 are incorporated herein.

80.    As set forth above, the Defendant Property is property, real or personal, involved a conspiracy, in violation of 18 U.S.C. § 1956(h), to violate and substantive violations of:

a.    18 U.S.C. § 1956(a)(1)(A)(i), that is, by conducting financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, violations of: 18 U.S.C. § 1030 (computer intrusion) and 18 U.S.C. § 1343 (wire fraud), knowing that the property involved in such financial transactions represented the proceeds of some form of unlawful activity, with the intent to promote the carrying on of specified unlawful activity, to wit, violations of 18 U.S.C. § 1030 (computer intrusion) and 18 U.S.C. § 1343 (wire fraud); and

b.    18 U.S.C. § 1956(a)(1)(B)(i), that is, by conducting financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, violations of: 18 U.S.C. § 1030 (computer intrusion) and 18 U.S.C. § 1343 (wire fraud), knowing that the property involved in such financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of said specified unlawful activity.

81.    Accordingly, the Defendant Property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 or property traceable to such property.

20

WHEREFORE, the United States of America requests:

a.       That a Warrant and Monition, in the form submitted herewith, be issued to the Department of Homeland Security – Homeland Security Investigations, the United States Marshals for the District of Massachusetts, or their designees, commanding seizure of the Defendants *in rem*, and to give notice to all interested parties to appear and show cause why the forfeiture should not be decreed;

b.       That judgment of forfeiture be decreed against the Defendants *in rem*;

c.       That thereafter, the Defendants *in rem* be disposed of according to law; and

d.       For costs and all other relief to which the United States may be entitled.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

Dated: August 3, 2026                    By:    */s/ Carol E. Head*
                                                CAROL E. HEAD
                                                DAVID HOLCOMB
                                                Assistant United States Attorneys
                                                United States Attorney's Office
                                                1 Courthouse Way, Suite 9200
                                                Boston, MA 02210
                                                (617) 748-3100
                                                carol.head@usdoj.gov
                                                david.holcomb@usdoj.gov

                                                GREGORY JON NICOSIA, JR.
                                                Trial Attorney
                                                National Security Division
                                                U.S. Department of Justice
                                                950 Pennsylvania Avenue, NW
                                                Washington, DC 20530
                                                (202) 353-4273
                                                Gregory.Nicosia@usdoj.gov

21

Verification

I, Jeffrey Porter, hereby verify and declare, under penalty of perjury, that I am a Special Agent with the Department of Homeland Security – Homeland Security Investigations and, pursuant to 28 U.S.C. § 1746, that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to my own knowledge, information, and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, and my investigation of this case together with other law enforcement officers.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct. Executed this 31st day of July 2026.

Jeffrey Porter
Special Agent
Homeland Security Investigations

22